```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                              )
            v.                )  Criminal No. 09-292
                              )
FRED WOOLUM (a/k/a sebastian00805) )
```

**UNITED STATES SENTENCING MEMORANDUM**

**I. INTRODUCTION**

The defendant, Fred Woolum, pled guilty to engaging in a child exploitation enterprise from January 1, 2007, to September 22, 2009. Mr. Woolum is scheduled to be sentenced for this crime on February 18, 2011. The United States submits this sentencing memorandum to assist the Court in imposing a fair, reasonable, and just sentence.

**II. TITLE 18, UNITED STATES CODE, SECTION 3553(a)**

This Court must impose a sentence that is reasonable in light of the factors listed in 18 U.S.C. § 3553(a) (the "Section 3553(a) factors"). Section 3553(a) directs this Court to impose a sentence that is sufficient to account for each of the relevant Section 3553(a) factors but that is no longer than necessary. Under the facts of this case, a substantial period of imprisonment, followed by an extended period of supervised release, should be imposed to sufficiently account for each of the Section 3553(a) factors.

**A. The nature and circumstances of the offense and the history**

**and characteristics of the defendant**

"Children are exploited, molested, and raped for the prurient pleasure" of those who collect and distribute images of children being sexually abused. *United States v. Goff*, 501 F.3d 250, 259 (3d Cir. 2007).  Collectors and distributors support suppliers. *Id*. at 259.  "There is nothing 'casual' or theoretical about the scars [the child victims] will bear from being abused for [collectors'] advantage." *Id*.  "The simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  'The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *Goff*, 501 F.3d at 259 (citing *New York v. Ferber*, 458 U.S. 747, 759 (1982)).  In explaining its jurisprudence on this subject, the Supreme Court has recognized that "as a permanent record of a child's abuse, the continued circulation" of sexual abuse images of children harms the child victims, and "[l]ike a defamatory statement, each new publication . . . cause[s] new injury to the child's reputation and emotional well-being." A*shcroft v. Free Speech Coalition*, 535 U.S. 234, 249-50 (2002).

The preceding paragraph provides perspective for the serious crime committed by Mr. Woolum.  The remarkably well-drafted Presentence Report ("PSR") contains an impressive and very helpful statement of Mr. Woolum's offense conduct.  The following

factual summary is included for ease of reference and to highlight some of the most salient features of Mr. Woolum's criminal conduct and the operation of the group.

For several years leading up to September 2009, an international group of online sexual offenders used an otherwise legitimate social networking internet site called Multiply.com to distribute thousands of sexually explicit images of children to each other.  Many of the images were of prepubescent, mostly male children, some as young as infants, being graphically sexually abused and sometimes sodomized or subjected to bondage.  The group included at least three members who personally produced sexual abuse images of children or engaged in sexual contact offenses against children.  At least two of the members shared the sexual abuse images they produced with other members of the group.

The group was led, organized, preserved, and maintained by Stephen Sims, although certain other members exercised managerial functions on occasion.  Mr. Sims developed internal security procedures and instructed other members on how to implement the security procedures.  With Mr. Sims's guidance, the group relied upon the internal security options offered by Multiply.com to, in essence, create a private website dedicated to the online sexual exploitation of children by squatting on the servers of Multiply.com.

Mr. Sims vetted prospective group members who were identified by him or directed to him by other group members.  Mr. Sims would interview prospective members to ensure that they were not law enforcement officers and to ensure that they were capable and willing to distribute sexual abuse images of children to the group and able to follow the group's security procedures.  Group membership was maintained by continuing to share sexual abuse images of children with the group.  A group member would do this by posting the images or videos to his Multiply.com account.

The access control settings of each account were set to allow access only to other group members.  Membership in the group could be terminated if a particular member did not continue to post new images or videos to his account or if he did not adequately follow the group's security rules.  Mr. Sims was instrumental in approving new group members as well as in determining whose membership in the group should be terminated.  In addition, Mr. Sims was instrumental in resolving issues concerning the group's operations such as what content should and should not be posted.

Multiply.com, like most social networking sites, allowed users to not only post images and videos, but also to comment upon the content on their accounts as well as on the accounts of other Multiply.com users.  Many of the members of the group relied upon this feature to communicate with each other about the

operation of the group.  Many of the members of the group also relied upon this feature to gleefully express how much they enjoyed observing the degrading molestation of children and their interests in sexually abusing children themselves.

Members participated in the group from computers ranging from the Western District of Pennsylvania to several states as well as to several foreign countries.  It should be noted that, while the general preference of most group members was sexual abuse images and videos of young boys, several members of the group preferred such images and videos of prepubescent and adolescent girls.  Some group members attempted to accommodate other members by, for example, posting images of young girls on their accounts even if the posting member's sexual preference was for young boys.

Mr. Woolum was a long-time member of the group.  He served as Mr. Sims's silent partner and assumed organizational and operational responsibilities on occasion.  Mr. Woolum provided advice to other group members on how to configure and use Multiply.com accounts to most effectively participate in the group.  One of the Multiply.com accounts he was using during 2008 and 2009 to participate in the group was reviewed pursuant to federal search warrants prior to his arrest in October 2009.  The review established that he had posted to his account visual depictions of minors engaged in sexually explicit conduct and

thereby distributed them to the other group members. Among the visual depictions of minors that were observed on Mr. Woolum's Multiply.com account were –

    (1) A video of a prepubescent boy playing with a toy truck and then masturbating.

    (2) A video of two prepubescent boys inserting their fingers into each other's rectums and masturbating each other.

    (3) A video of two prepubescent boys masturbating each other, having anal sex with each other, and having oral sex with each other.

**B. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

    As the Supreme Court and the Third Circuit Court of Appeals have stated on several occasions, the distribution and collection of sexual abuse images of children is not a victim-less crime. The sexually exploited children are continually haunted by the existence and spread of their images through a global process of distribution and collection they are unable to control. The images depict the worst events of their lives in graphic detail.

    The fact that offenders like Mr. Woolum seek and obtain their images instead of being revolted by them leaves the child victims feeling betrayed by their fellow man and asking how another human being can take pleasure in collecting images of

their pain.  When the mental anguish caused by the direct sexual offense begins to subside, the child pornography crimes are always there to further discourage and distress each of them.  As the Supreme Court has stated, a child pornography crime is a defamation that will not go away.

As noted above, child victims cannot control their further victimization through the distribution and collection of their images.  This Court may likewise be unable to comprehensively curb or control their victimization.  This Court is, however, able to set a standard that will convey a clear message to those who try to foolishly rationalize themselves into thinking that online sexual offending is a victim-less pursuit.  Sentencing is, in fact, largely and properly about standard-setting and message-sending.  The sentence this Court imposes in this case should set a standard for online sexual offenders to respect and a message for them to heed – the collection and distribution of sexual abuse images of children, whether engaged in by a recluse or by a gregarious social networker, is a serious crime that repeatedly victimizes children and leads to further production and contact offending.

The nature and scope of Mr. Woolum's offense demands not only deterrence but also punishment.  In light of the extreme content of the sexual abuse images and the discussions among group members about law enforcement efforts to catch online

sexual offenders, Mr. Woolum, as well as his fellow group members, clearly knew that what he was doing was illegal and subject to serious punishment.  Mr. Woolum also knew that members of the group were not only distributing thousands of sexual abuse images of children but were also producing such images and engaging in or plotting the molestation of children.  He continued to participate in the group despite the fact that its existence and operation fostered such crimes and further disinhibited members from committing them.

**C. The need for the sentence imposed to afford adequate deterrence to criminal conduct**

There is a critical need for the sentence to deter not only Mr. Woolum but also any others who may be inclined to sexually exploit children.  Online sexual offenses are most often committed in private settings that are remote from their victims.  Such crimes are high-volume offenses that are drastically under-reported.  In fact, unlike most crime victims, the victims of online sexual offenses, while generally cognizant of the trafficking and collection of their sexual abuse images, are not able to report the time or the location of these crimes to the police.  As a result, there is a premium on general deterrence because law enforcement officers, no matter how efficient and dedicated, will never be able to detect, let alone investigate and prosecute, more than a small fraction of the online sexual

offenses that are committed.  Mr. Woolum's sentence should, therefore, contain a period of imprisonment that not only disinclines him from engaging in further criminal behavior but also is long enough to disincline others from attempting to commit crimes, particularly crimes against children.

**D. The need for the sentence imposed to protect the public from further crimes of the defendant**

Mr. Woolum's conduct reveals that he has a sexual interest in children.  His decision to act in a criminal manner upon that sexual interest by collecting and distributing visual depictions of minors engaged in sexually explicit conduct is a cause for great concern.  In addition, within the last 20 years, Mr. Woolum was convicted of indecent exposure on two occasions as a result of incidents in North Carolina and Tennessee, and he committed one of his many DUI crimes during that time period while in the nude.  Such overt and risky behavior is alarming, particularly in light of Mr. Woolum's demonstrated sexual interest in children.

Mr. Woolum has accepted responsibility for his offense conduct.  Mr. Woolum's decision to acknowledge his criminal behavior is a good sign indicating that his behavior in the future may not mirror his behavior during the last twenty years.  Such an acknowledgment, however, does not obviate the need for a substantial period of incarceration to account for, among other things, the need to protect the public.

**E. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Facilities operated by the Bureau of Prisons ("BOP") have programs and resources specifically designed to address mental health issues, including sexual offender treatment and sexual offender management programs.  Therefore, Mr. Woolum, if incarcerated in a BOP facility, will have the opportunity to receive appropriate treatment and care if he chooses to take advantage of it.  It should also be noted that BOP facilities have programs designed to teach vocational skills to interested inmates and to assist inmates with addressing substance abuse issues.  Mr. Woolum would likely benefit from these programs, particularly in light of his history of driving while intoxicated.

**F. The available sentences**

A statutory minimum 20 years of imprisonment applies to a conviction for engaging in a child exploitation enterprise.  A statutory maximum of life imprisonment applies as well.  A fine of up to $250,000 may be imposed.  A term of supervised release of at least five years and up to life must be imposed to be served upon release from a term of imprisonment.

**G. The applicable sentencing guideline range and policy statements**

Mr. Woolum's sentencing guideline range is 240 to 293 months in prison followed by a life term of supervised release. The sentencing guideline fine range is $25,000 to $250,000.

**H. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct**

Sentencing can never achieve the precision of a science experiment.  And, regardless of the empirical support for a particular guideline range or sentence, many people will disagree about what specific sentence a particular defendant should receive in a particular case.  What most people will not disagree about is that similarly situated people who commit crimes under similar circumstances should receive similar punishments.  Such congruence creates fairness and predictability.  Fairness produces justice, and predictability produces deterrence.  Someone contemplating a criminal act, even for just a moment, is more likely to be deterred if he knows that, if caught and convicted, he will receive a serious sentence and that it will not matter significantly what prosecutor or judge is assigned to his case.  The more variability there is in sentencing, the less likely it is that the criminally inclined will be deterred.

The sentencing guidelines are a direct result of a generally embraced principle that variability in sentencing should be limited.  "The [Sentencing Reform Act] was motivated by a desire

on the part of Congress to establish a rational sentencing system to provide for certainty, uniformity, and proportionality in criminal sentencing.  The intent of Congress was to eliminate an 'unjustifiably wide range of sentences [imposed on] offenders with similar histories, convicted of similar crimes, committed under similar circumstances,' and to recognize differences between offenses." S.Rep. No. 98-225, at 38, 45-46; United States Sentencing Commission, "*The History of the Child Pornography Guidelines*" (October 2009).  There is always a need to avoid unwarranted sentencing disparities between similar defendants and to avoid unwarranted sentencing similarities between different defendants.  The best way to avoid such unfair disparities and similarities is to respect the sentencing guidelines and to impose a sentence that is consistent with them unless the guideline range in a particular case is just unreasonable.

**I. The need to provide restitution to any victims of the offense**

No claim for restitution has been submitted by any of the victims of the offense.

**J. Forfeiture**

As stated in the plea agreement, any and all computers, electronic storage devices, and related electronic media that were seized on September 22, 2009, during the service of a

federal search warrant at Mr. Woolum's residence should be forfeited.

                                          Respectfully submitted,

                                          DAVID J. HICKTON
                                          United States Attorney

                                          <u>s/ Craig W. Haller</u>
                                          CRAIG W. HALLER
                                          Assistant U.S. Attorney
                                          700 Grant Street, Suite 4000
                                          Pittsburgh, Pennsylvania 15219
                                          (412) 644-3500 (Phone)
                                          PA ID No. 87714